UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NICO PAGAN,

                    Petitioner,

        v.

CHRISTEN PFEIFFER, Warden,

                    Respondent.

No.  2:18cv0240 MCE KJN

FINDINGS & RECOMMENDATIONS

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2014 conviction for second degree robbery (Cal. Pen. Code, § 211 [count 8]).  Petitioner was originally sentenced to eighteen years in state prison on four counts of robbery.  More particularly, petitioner claims there was insufficient evidence at trial to support a finding that he aided and abetted the armed robbery of a 7-Eleven in Sacramento as alleged in count eight and that reversal is required as a result of this constitutional error.

//

//

//

//

1

1   II.  Underline: Procedural History

2          By amended information dated May 6, 2014, petitioner was charged with four counts of

3   second degree robbery (Cal. Pen. Code,[1] § 211); the crimes were alleged to be serious pursuant to

4   section 1192.7(c), and it was further alleged that petitioner had previously been convicted of a

5   serious felony, to wit:  robbery on March 15, 2007 (§§ 667(a), 667(b)-(i), 1170.12).  (LD 1 at

6   132-37.)   Following trial, a jury found petitioner guilty of all counts.  (LD 1 at 152, 154-55 & LD

7   2 at 11-14; LD 5 at 77-79.)  The trial court found the prior conviction to be true.  (LD 1 at 155;

8   LD 5 at 87-89.)  On August 29, 2014, petitioner was sentenced to state prison for a total of

9   eighteen years.  (LD 2 at 50-51; LD 5 at 111-27.)

10         Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

11  District.  (LD 6 & 8.)  The Court of Appeal reversed petitioner's conviction as to counts six and

12  seven, modified the sentence accordingly, and affirmed the conviction as modified.[2]  (LD 9.)

13         Thereafter, petitioner filed a petition for review in the California Supreme Court, which

14  was denied on October 26, 2016.  (LD 10-11.)

15         Petitioner filed a state habeas petition in the Sacramento County Superior Court on July 3,

16  2017 (LD 12).  That court denied the writ on August 14, 2017 (LD 13).

17         Petitioner filed the instant petition on November 7, 2017, in the United States District

18  Court for the Northern District of California.  (ECF No. 1.)  The case was transferred to this court

19  on February 2, 2018.  (ECF No. 8.)

20         On March 23, 2018, petitioner sought to file an amended petition for writ of habeas

21  corpus.  (ECF No. 17.)  However, it was determined to be a mixed petition, and petitioner was

22  given the option of filing a motion to stay the proceedings, or to proceed on the single exhausted

23  claim.  (ECF No. 20.)  Ultimately, on October 16, 2018, following an unanswered order to show

24  cause directed to petitioner, the undersigned ordered respondent to answer the originally-filed

25  petition for writ of habeas corpus.  (ECF No. 28.)  Respondent answered on December 14, 2018.

26

27  [1] All further statutory references are to the California Penal Code unless otherwise indicated.

28  [2] The sentence was modified to a total term of fourteen years.  (LD 9 at 18.)

(ECF No. 31.)  Respondent lodged the state court record on February 15, 2019.  (ECF No. 32.)

III.  Facts[3]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal as to count eight specifically, the California Court of Appeal for the Third Appellate District provided the following factual summary:

### The Robbery Of Suzie's Adult Bookstore—May 9, 2013

> At approximately 1:00 a.m. on May 9, 2013, Robert Schrader, who was taking his lunch break from his job working security at Suzie's Adult Bookstore at Florin and Franklin, was on his way to his car at the far end of the parking lot when he saw three men standing together at the front of the parking lot. When Schrader was about 100 to 150 feet from the front door of the store and probably about three feet from the driver's door of his car, one of the men came up to him, put a pistol to his side, and told him to walk back inside the store, which he did. All three men had their faces partially covered and were carrying guns. One of them had a long shotgun.
>
> Once inside the store, Schrader was instructed to go behind the "cash wrap" and lie face down, which he did. One of the men with a pistol ordered the employee working the cash register, Richard Abodeely, to put the money from the register into a bag. Abodeely put approximately $700 from two registers and from underneath one of the registers into the bag.
>
> According to Abodeely, the barrel of the shotgun "looked a little bit longer than the average shotgun would look." According to another person in the store at the time of the robbery (Robert Gillies), the gun appeared to be a 12-gauge shotgun with a ribbed barrel. Still photographs taken from a surveillance video recorded inside the store during the robbery show a man wearing a grey hooded sweatshirt and a white shirt covering the lower half of his face holding a long-barreled shotgun. Other photographs show this person wearing dark sweat pants with white stripes and athletic shoes.
>
> A week after the robbery, Sacramento County Sheriff's Detective Mike French obtained the surveillance video from the store and familiarized himself with the shotgun, the athletic shoes, and the exposed portion of the face of the person who held the shotgun. At trial, he described the shoes as "a unique pair of athletic high-top basketball-type shoes" that "were multicolored with a unique design on the sides, as well as having a white sole."
>
> When Detective French later learned that Jackson had been arrested, and that Jackson and his partner were in possession of a full-length

---

[3]  The facts are taken from the unpublished opinion of the California Court of Appeal for the Third Appellate District in People v. Khalil Oshar Jackson, et al., case number C077072, filed August 12, 2016, a copy of which was lodged by respondent as LD 9.

3

shotgun, Detective French believed there was a very good possibility the shotgun could be related to the one used in the bookstore robbery because robberies committed with shotguns are relatively rare. Accordingly, on July 1, 2013, Detective French obtained from a detective with the Sacramento Police Department the shotgun and photographs of the shoes Jackson was wearing when he was arrested. When he compared the shoes Jackson was wearing with those shown in the surveillance video, they appeared to him "to be one and the same from every angle that you could view them."

### The Robbery Of Lichine's Liquors—May 21, 2013

Around 9:00 p.m. on May 21, 2013, Edward Cooper and Gerald Okumura were working at Lichine's Liquor on South Land Park Drive near Florin Road, when two men entered the store. Both men had shirts covering their faces, and one of them had a long-barreled, 12-gauge pump shotgun. The man with the shotgun asked, "Where is the money?" Okumura opened the cash register, and the other man (whom the parties stipulated was Jeremiah Botley) went behind the counter and dumped the bills and the coins from the register drawer into a bag or a shirt. The two men then ran out the door.

### The Traffic Stop—May 21, 2013

Around 9:15 p.m. on May 21, 2013, Sacramento Police Detective John Montoya was working a uniformed patrol assignment in a marked police car in south Sacramento when he noticed a white Acura Integra traveling southbound on 24th Street make a left turn onto eastbound Meadowview Road at a rate of speed faster than surrounding traffic. At the time, Detective Montoya was northbound on 24th Street, getting ready to turn eastbound on Meadowview. As his was the first car at the limit line, he figured that the occupants of the Integra would have had to see him.

Detective Montoya saw the Integra travel eastbound on Meadowview for a distance of 50 to 100 yards and then very quickly make a U-turn in front of an apartment complex and drive back westbound toward 24th Street. The detective followed. At the corner of Meadowview and 24th, the Acura turned right onto 24th without stopping at a red light, then very quickly pulled into the parking lot of a liquor store. Detective Montoya pulled in behind them.

There were three men in the Acura. The driver was Pagan. Jackson was in the right front passenger seat, and Botley was the rear passenger. Detective Montoya patted them all down for weapons but did not find any. He later placed Pagan in the back of his patrol car, where Pagan can be seen on video counting bills that he removed from his pocket. About 18 minutes later, Pagan was still in the back of the patrol car, now with Jackson, and Pagan can be seen on video removing a handful of coins from his pocket and passing them back and forth from one hand to the other.

Detective Montoya did not find a shotgun in the Acura.

////

4

### The Robbery Of 7-Eleven—May 22, 2013

During the nighttime on May 22, 2013, a man named Jaspal (no other name) was working at a 7-Eleven on 43rd Avenue. At some point, a man came in who caught Jaspal's attention because he was looking around and talking on the phone. The man eventually asked Jaspal to pay him a dollar for a scratch-off lottery ticket, and when Jaspal opened the cash register to get the money, the man leaned forward to look into the cash drawer. Right after the man left, two other men entered the store; one was wearing a black Spider-Man mask and the other had his face covered with a handkerchief. The man in the mask showed Jaspal part of a gun in his pocket and asked Jaspal to open the register and give him money, which Jaspal did.

### The Robbery Of Food Stop—May 24, 2013

On the afternoon of May 24, 2013, Umair Aslam was working the cash register at Food Stop in south Sacramento, off of Meadowview Road and Amherst Street, when two men—one carrying a "very large shotgun" and the other carrying what appeared to be a handgun— entered the store and robbed him. Both men had their faces covered with T-shirts wrapped around their heads. Aslam put the money in a bag, and the men ran out. Aslam followed and saw a white Acura, probably a late '90's model Integra, speed off. Surveillance video from the store showed that the two men got out of a white Acura before they entered the store for the robbery.

### The Attempted Robbery Of The Arco AM/PM—May 30, 2013

At around 11:00 p.m. on May 30, 2013, Sacramento Police Officer Ryan Trefethen was on patrol in south Sacramento when he noticed a dark-colored SUV without any taillights illuminated pulling around the back of the Arco AM/PM gas station on the northwest corner of Florin Road and Amherst Street. Officer Ryan turned north on Amherst and looked behind the gas station but did not see the SUV, so he intended to just keep driving north when he saw two people walking southbound toward the gas station on the sidewalk on the west side of the street. The two individuals had hooded sweatshirts pulled over their heads and white shirts covering their faces. As Officer Trefethen watched the two individuals continue toward the gas station, he saw that the "tall skinny" one—whom Officer Trefethen identified at trial as Jackson—was wearing jeans and shoes that appeared to match pictures he had seen from an information bulletin on the recent robberies in the area, including Lichine's Liquor, Food Stop, and Suzie's Adult Book Store.

Officer Trefethen called dispatch to report the suspects, then made a U-turn. As he did so, he lost sight of the two individuals momentarily as they were walking past a shrub. When he regained sight of them, he saw them enter the property of the gas station, then head toward the sidewalk on Florin Road. The second individual (Ronnie Pannell) sat down on a bus stop bench, and Jackson walked westbound along Florin. Eventually, another officer pulled up to the bus stop and Officer Trefethen pursued Jackson, apprehending him at the corner of Florin Road and Freeport Boulevard. The officer did not find any

weapons on Jackson but did find a white T-shirt under the collar of his hooded sweatshirt. Later, he found a blue walkie-talkie in Jackson's pants pocket tuned to channel 22.

After placing Jackson in the back of a patrol car and seeing that Pannell was in the back of another, Officer Trefethen retraced the course of the two men to see if they had dropped any contraband or weapons. When he reached the shrub where he had lost sight of them momentarily, he found a full-length pump shotgun sitting on top of the shrub.

Kathleen Boyd, a forensic investigator with the Sacramento Police Department, obtained 16 latent prints from the shotgun. Kathleen Modeste, a latent print examiner with the department, matched two of the latent prints to Jackson and two of the prints to Pagan.

### *Postarrest Investigation*

Pagan was stopped and arrested on May 31, 2013, in a white Acura Integra. On the front passenger seat of the Integra was a blue walkie-talkie tuned to channel 22 that appeared identical to the walkie-talkie found on Jackson the day before.

Sacramento Police Detective Jimmy Lee Vigon showed Pagan an image of a person taken from surveillance video at the Food Stop on May 24, just before the robbery, and Pagan admitted it was him. Detective Vigon also testified there were "some very striking similarities between" the white car observed in connection with the Food Stop robbery and the white Acura Integra Pagan was driving when he was stopped and arrested that led the detective to believe they were the same vehicle. When Detective Vigon showed Pagan an image of the white car from the Food Stop video, Pagan initially identified it as his girlfriend's car but later said it was not and, "out of the blue," told Detective Vigon, "you're not gonna trick me into admitting I drove anybody there to do a robbery."

On June 13, 2013, Sacramento Police Detective Mike Mullay was at the 7-Eleven on 43rd Avenue on another matter, when the store manager mentioned to him that the store clerk had seen someone suspicious in the store before the robbery on May 22 who could be seen on the surveillance video. Detective Mullay looked at the video and recognized the person as Pagan.

Detective Mullay also conducted an investigation into some robberies that were committed by a man named Greg Gadlin. During a search of the bedroom in Gadlin's residence, a black Spider-Man mask was found. On May 6, 2013, Pagan had answered the door at Gadlin's apartment when a parole agent came looking for Gadlin, telling the agent that his "homeboy" was not there.

(People v. Jackson, et al., 2016 WL 4256885 at *1-4 (Aug. 12, 2016); see also LD 9.)

////

////

1    IV.   Standards for a Writ of Habeas Corpus

2           An application for a writ of habeas corpus by a person in custody under a judgment of a

3    state court can be granted only for violations of the Constitution or laws of the United States.  28

4    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5    application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

6    U.S. 62, 67-68 (1991).

7           Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

8    corpus relief:

9                   An application for a writ of habeas corpus on behalf of a person in
                    custody pursuant to the judgment of a State court shall not be granted
10                  with respect to any claim that was adjudicated on the merits in State
                    court proceedings unless the adjudication of the claim -
11

12                  (1) resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established Federal law, as
                    determined by the Supreme Court of the United States; or
13

14                  (2) resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented in the
                    State court proceeding.
15

16   28 U.S.C. § 2254(d).

17          For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

18   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

19   Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct.

20   38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v.

21   Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining

22   what law is clearly established and whether a state court applied that law unreasonably."  Stanley,

23   633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

24   precedent may not be "used to refine or sharpen a general principle of Supreme Court

25   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall

26   v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per

27   curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted

28   among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

1  correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it

2  cannot be said that there is "clearly established Federal law" governing that issue. Carey v.

3  Musladin, 549 U.S. 70, 77 (2006).

4       A state court decision is "contrary to" clearly established federal law if it applies a rule

5  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

6  precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

7  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

8  writ if the state court identifies the correct governing legal principle from the Supreme Court's

9  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [4] Lockyer v.

10  Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

11  997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply

12  because that court concludes in its independent judgment that the relevant state-court decision

13  applied clearly established federal law erroneously or incorrectly. Rather, that application must

14  also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550

15  U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

16  'independent review of the legal question,' is left with a "'firm conviction'" that the state court

17  was "'erroneous'""). "A state court's determination that a claim lacks merit precludes federal

18  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

19  decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

20  U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

21  court, a state prisoner must show that the state court's ruling on the claim being presented in

22  federal court was so lacking in justification that there was an error well understood and

23  comprehended in existing law beyond any possibility for fair-minded disagreement." Richter,

24  562 U.S. at 103.

25       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

26  

27  

28  

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

2   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

3   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

4   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

5   considering de novo the constitutional issues raised.").

6        The court looks to the last reasoned state court decision as the basis for the state court

7   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

8   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

9   previous state court decision, this court may consider both decisions to ascertain the reasoning of

10  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

11  federal claim has been presented to a state court and the state court has denied relief, it may be

12  presumed that the state court adjudicated the claim on the merits in the absence of any indication

13  or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

14  may be overcome by a showing "there is reason to think some other explanation for the state

15  court's decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

16  (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but

17  does not expressly address a federal claim, a federal habeas court must presume, subject to

18  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289,

19  298 (2013) (citing Richter, 562 U.S. at 98.  If a state court fails to adjudicate a component of the

20  petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith,

21  539 U.S. 510, 534 (2003).

22       Where the state court reaches a decision on the merits but provides no reasoning to

23  support its conclusion, a federal habeas court independently reviews the record to determine

24  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

25  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

26  review of the constitutional issue, but rather, the only method by which we can determine whether

27  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

28  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

1  reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

2       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

3  <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

4  just what the state court did when it issued a summary denial, the federal court must review the

5  state court record to determine whether there was any "reasonable basis for the state court to deny

6  relief." <u>Richter</u>, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

7  have supported the state court's decision; and then it must ask whether it is possible fairminded

8  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

9  decision of [the Supreme] Court." <u>Id.</u> at 101.  The petitioner bears "the burden to demonstrate

10  that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d

11  925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

12       When it is clear, however, that a state court has not reached the merits of a petitioner's

13  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

14  habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

15  F.3d 1099, 1109 (9th Cir. 2006).

16  V.  <u>Petitioner's Claim</u>

17       *The Sufficiency of the Evidence of Aiding and Abetting in Count Eight*

18       Petitioner claims that the evidence concerning aiding and abetting the armed robbery at 7-

19  Eleven was insufficient to support his conviction in count eight, requiring relief in these

20  proceedings.  (ECF No. 1 at 5-7.)  Respondent maintains the state court's determination was

21  reasonable and thus precludes federal habeas relief.  (ECF No. 31 at 17-22.)

22       The last reasoned rejection of petitioner's claim is the decision of the California Court of

23  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

24  this claim as follows:

25                    ***Sufficiency Of The Evidence***

26       "Our role in reviewing the sufficiency of the evidence in a criminal
        case is a limited one. [Citation.] We examine the entire record in the
27      light most favorable to the judgment below to determine whether it
        discloses substantial evidence such that any rational trier of fact

28

could find the essential elements of the crime beyond a reasonable doubt. [Citations.] Substantial evidence is "'evidence which is reasonable, credible, and of solid value.'" [Citation.] Although 'mere speculation cannot support a conviction' [citation], the trier of fact is entitled to draw reasonable inferences from the evidence and we will "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" [Citations.] [¶] The standard of review remains the same in a case based upon circumstantial evidence. [Citation.]' "[W]e must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' [Citation.] We must decide whether the circumstances reasonably justify the jury's findings, but 'our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.'" (*People v. Bohana* (2000) 84 Cal.App.4th 360, 367-368.)

Evidence is substantial if "a reasonable and impartial mind could justifiably draw the same inferences therefrom that the jury necessarily drew in order to arrive at its verdict," and "evidence does not become unsubstantial simply because other reasonable minds might differ as to what inferences should be drawn therefrom, or because this court as a trier of fact might have drawn different inferences." (*People v. Bertholf* (1963) 221 Cal.App.2d 599, 603.)

[¶]-[¶]

### *Pagan—The Robbery Of 7-Eleven*

Pagan contends the evidence was insufficient to prove he aided and abetted the robbery of 7-Eleven because the entire charge against him was "based upon speculation that Gregory Gadlin committed the robbery." According to Pagan, the assumption "that Gadlin was one of the robbers, is the foundation of the charge against [Pagan], and absent this assumption the mask found in Gadlin's home and [Pagan] being at his residence two weeks before the robbery is irrelevant."

Again, however, we find that the argument by Pagan's appellate attorney is contrary to the principles of *Sanghera*[5] in that it does not account for all of the evidence or view all of that evidence in the light most favorable to the jury's verdicts. The evidence showed that Pagan entered the 7-Eleven and behaved in a manner that was consistent with casing the store for an upcoming robbery, including looking into the cash register drawer. Right after Pagan left, two other men entered the store; one was wearing a black Spider-Man mask and the other had his face covered with a handkerchief. They robbed the

---

[5] <u>People v. Sanghera</u>, 139 Cal.App.4th 1567 (2006).

store. A black Spider-Man mask was found at the residence of Gadlin, whom Pagan described as his "homeboy." In addition, there was the evidence that Pagan participated in a similar manner in the robbery of Food Stop—casing the store before the actual robbery. Taken as a whole and viewed in the light most favorable to the jury's verdicts, the evidence was sufficient to support the jury's finding that Pagan aided and abetted the robbery of 7-Eleven.

(People v. Jackson, et al., 2016 WL 4256885 at *4, 8; LD 13.)

### Applicable Legal Standards

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Id. (citations omitted).

1    The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements

2  of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16.  In performing a

3  <u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce</u>

4  <u>v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  When the factual record supports conflicting

5  inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of

6  the prosecution, and must defer to that resolution.  <u>Jackson</u>, 443 U.S. at 326.

7              <u>Analysis</u>

8    The undersigned considers whether the Third District Court of Appeal's decision that

9  there was sufficient evidence to support petitioner's conviction for robbery under an aider and

10  abettor theory was a reasonable determination in light of Supreme Court precedent. It was.

11    Initially, the undersigned notes that to the degree petitioner's argument can in any way be

12  interpreted to allege the state appellate court's decision was based on an unreasonable

13  determination of the facts in light of the evidence presented at trial (28 U.S.C. § 254(d)(2)), he is

14  mistaken.  A review of the testimony and evidence of record reveals no unreasonable

15  determination of facts.  <u>Stanley</u>, 633 F.3d at 859.

16    Here, as referenced in the state court opinion, there is evidence from which a reasonable

17  trier of fact could conclude petitioner's conviction for robbery on an aiding and abetting theory in

18  count eight was supported by sufficient evidence.  A man entered the 7-Eleven store at nearly

19  eleven p.m. on May 22, 2013, close to closing time.  (LD 3 at 307, 314; LD 4 at 9-10.)  The man

20  had long hair and was wearing a black jacket.  (LD 4 at 9-11.)  The clerk was suspicious of the

21  man's activity: "he was, like, running around," talking on the phone, and "looking around."  (LD

22  3 at 308-09; LD 4 at 6, 26; <u>see also</u> LD 4 at 199-200.)  When the man approached the clerk, he

23  asked to cash out a lottery scratcher ticket and requested a "gold coin" after leaning forward and

24  looking into the cash register.  (LD 3 at 309-11, 315; LD 4 at 7-8.)  In the clerk's experience,

25  typically such lottery ticket winners ask for another ticket.  (LD 3 at 309.)  Almost immediately

26  after the suspicious man exits the 7-Eleven store, or less than two minutes later according to the

27  store surveillance video, two men enter the store.  (LD 3 at 310; LD 4 at 8, 11-12.)  One of the

28  men is wearing a black Spider Man mask and the other had his face covered with "a hankie."

1   (LD 3 at 310.)  The man with the Spider Man mask was armed and directed the clerk to give him

2   the money from the register.  (LD 3 at 310-11.)  Money, including coins, and lottery tickets were

3   taken before the men left the store.  (LD 3 at 312; LD 4 at 12.)  The video surveillance footage

4   from the incident at the 7-Eleven store was played for the jury.  (See, e.g., LD 3 at 312-13.)

5   Photographs of petitioner taken as he appeared in May 2013 were also admitted into evidence.

6   (LD 4 at 144-45 [appearance had changed by the time of trial].)  A detective involved in the

7   investigation recognized petitioner as the man in the 7-Eleven store immediately prior to the

8   robbery.  (LD 4 at 201.)

9        It can also be reasonably inferred from the testimony of a state parole agent that petitioner

10   was involved or associated with the incident where, when the parole agent arrived at the parolee's

11   home on May 6, 2013, petitioner was present.  (LD 4 at 118-19.)  Petitioner told the parole agent

12   his "homeboy" was not there.  (LD 4 at 119.)  A later search of the parolee's bedroom revealed a

13   black Spider Man mask, among other items, like the one used in the May 22, 2013, robbery of the

14   7-Eleven.  (LD 4 at 203-04.)  Additionally, other evidence adduced at trial indicated petitioner

15   also entered the Food Stop store on May 24, 2013, minutes prior to that store being robbed at

16   gunpoint.  (LD 3 at 249, 251-52, 260-62; LD 4 at 145-46.)  Lastly, the jury heard evidence that a

17   white Acura Integra, similar in appearance to the vehicle petitioner claimed to own, or was owned

18   by his girlfriend, was seen speeding from the Food Stop immediately after the robbery.  (LD 3 at

19   254, 258, 263, 265-66, 271, 278, 297; LD 4 at 143-49, 152, 192-93.)  In surveillance footage

20   shown to the jury, the clerk at Food Stop testified the two men getting out of a white car were the

21   same two men who robbed the store.  (LD 3 at 267.)

22        The jury was instructed that in order to find petitioner guilty of robbery on an aiding and

23   abetting theory, it must find (1) the perpetrator committed the crime, (2) petitioner knew the

24   perpetrator intended to commit the crime, (3) before or during the crime petitioner intended to aid

25   and abet the perpetrator in the commission of the crime, and (4) petitioner's words or conduct did

26   in fact aid and abet the perpetrator in committing the crime.  (LD 1 at 176; LD 4 at 271.)  From

27   the evidence referenced above, and noted in the state appellate court's opinion, the jury could

28   reasonably infer or find that petitioner knew his co-defendant at trial committed a robbery of the

14

1    7-Eleven store, and that petitioner knew his co-defendant intended to do so before the

2    commission of the crime where petitioner's conduct in entering the 7-Eleven store just minutes

3    before it was robbed, while looking around the store, and particularly into the cash register, aided

4    and abetted his co-defendant in committing that crime.

5        Viewing the evidence in the light most favorable to the jury's verdict, the Third Appellate

6    District's determination was reasonable.  Jackson v. Virginia, 443 U.S. at 326.  The state court's

7    determination was not "so lacking in justification that there was an error well understood and

8    comprehended in existing law beyond any possibility for fair-minded disagreement." Richter,

9    562 U.S. at 103.

10        Given the foregoing, it was not an unreasonable application of the Jackson standard for

11    the state appellate court to conclude that there was sufficient evidence to permit the jurors to draw

12    the reasonable inference that petitioner's actions just prior to the robbery of the 7-Eleven store on

13    May 22, 2013, amounted to aiding and abetting the robbery, nor did the state appellate court base

14    its finding on an unreasonable application of the facts.  Therefore, it cannot be said that the Third

15    District Court of Appeal's rejection of petitioner's challenge to the sufficiency of the evidence

16    was "objectively unreasonable."  See Coleman, 566 U.S. at 651; Juan H., 408 F.3d at 1275 n.13.

17    As a result, the undersigned recommends the claim be denied.

18    VI.  Conclusion

19        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

20    habeas corpus be denied.

21        These findings and recommendations are submitted to the United States District Judge

22    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23    after being served with these findings and recommendations, any party may file written

24    objections with the court and serve a copy on all parties.  Such a document should be captioned

25    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

26    he shall also address whether a certificate of appealability should issue and, if so, why and as to

27    which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

28    applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

1    § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

2    service of the objections.  The parties are advised that failure to file objections within the

3    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

4    F.2d 1153, 1156 (9th Cir. 1991).

5    Dated:  September 25, 2020

6

7                                                                    KENDALL J. NEWMAN

8    Paga0240.157                                       UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28